# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**UNITED STATES OF AMERICA,**

v.



*Defendant.*

---

Nos. 22-mj-11073,
23-mc-00024

**OPINION**

<u>**APPEARANCES:**</u>

**Eli Jacobs**
U.S. ATTORNEY'S OFFICE, DISTRICT OF NEW JERSEY
970 Broad Street
Newark, NJ 07102

*On behalf of United States.*

**Shelley D. Albert**
DARIO, ALBERT, METZ & EYERMAN, LLC
345 Union Street
Hackensack, NJ 07601

*On behalf of Defendant.*

**O'HEARN, District Judge.**

### INTRODUCTION

This matter comes before the Court on the question of Defendant ███████'s competency to proceed and, if he is incompetent, whether 18 U.S.C. § 4241(d) requires his commitment to the custody of the Attorney General for inpatient hospitalization. For the reasons set forth below, the Court finds that ███ is presently incompetent to stand trial, but concludes that mandatory inpatient commitment under § 4241(d), as applied here, would violate due process. Accordingly, the Government's request to commit ███ to the custody of the Attorney General for inpatient hospitalization is denied. The Court will, however, afford the Government an opportunity to consider a less intrusive, outpatient alternative and directs the parties to meet and confer on that issue. The Court therefore defers ruling on ███'s request to dismiss the charges.

### I.    BACKGROUND

███ is a thirty-four-year-old intellectually and developmentally disabled adult whose limitations long predate this federal prosecution. As outlined further below, the record reflects that concerns about his functioning were recognized when he was approximately three-and-a-half years old, and that his condition has remained chronic and pervasive since childhood. ███'s school records, IEP materials, Division of Developmental Disabilities ("DDD") records, psychiatric records, and prior guardianship materials all show a longstanding history of impairment in cognition, social functioning, and emotional functioning that is not reasonably disputed.

Against that backdrop, this federal case began on March 9, 2022, when a complaint charged ███ with one count of distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A). (*United States v.* ███ 22-mj-11073, ECF No. 1). An arrest warrant issued the same day, and ███ was arrested on March 10, 2022. (*Id.* at ECF No. 2). Following a bond hearing before

Magistrate Judge Andre M. Espinosa, ███ was released on a $100,000 bond.[1] (*Id.* at ECF Nos. 4, 6). On October 29, 2022, the Government advised the Court that ███ had purportedly signed a plea agreement contemplating a guilty plea to a lesser-included possession offense under § 2252A(a)(5) and requested the Court schedule a hearing pursuant to Federal Rule of Criminal Procedure 11. (*See id.* at ECF No. 44-1). When the matter came before the undersigned for a plea hearing on August 24, 2023, (*see id.* at ECF No. 86), defense counsel repeatedly requested additional time to ensure that ███ understood the Court's questions, which itself raised concern as to whether he adequately comprehended the charges and the proceeding. After further colloquy—including multiple off-the-record discussions—the Court was left with immediate and serious doubt as to whether ███ understood the nature of the charge or the proceedings themselves.[2] (*Id.*).

At that same hearing, during an off-the-record exchange with counsel, the Court learned for the first time that ███ was already under legal guardianship. However, neither counsel was able to answer the Court's questions regarding the nature and scope of that guardianship. Accordingly, the Court adjourned the plea hearing until after ███ could be evaluated for competency, and requested additional documentation concerning the guardianship, including when it had been granted, on what grounds, and what orders and applications supported it. (*Id.* at 9).

---

[1] ███ was released into the custody of his mother and placed on home incarceration, which restricted him to his residence under 24-hour lock-down except for medical necessities and court appearances, or other activities specifically approved by the Court. (███ 22-mj-11073, ECF No. 5).

[2] Based on the Court's observations and interactions with ███ that day, it is inconceivable to the Court how either counsel could have reasonably believed that he was competent to consider, let alone execute, a plea agreement.

Those materials were provided to the Court on September 1, 2023, and established that on October 25, 2013, ████'s parents filed a verified complaint in the New Jersey Probate Part seeking appointment of a guardian on the grounds that he was mentally incapacitated. (*In the Matter of* ████████████ No. CP-0310-2013). The guardianship application was supported by two physician certifications. One, dated October 17, 2013, diagnosed ████ with pervasive developmental disorder NOS and major depressive disorder, as well as profound mental retardation,[3] seizure disorder, and recurrent aspiration. (*Id.*). The other, dated October 18, 2013, documented a diagnosis of Autistic Disorder with no prognosis of remission, as well as profound mental retardation, seizure disorder, recurrent aspiration, and cognitive impairment. (*Id.*). After a March 6, 2014 hearing, at which the Probate Part appointed counsel for ████[4] the court entered an order on March 17, 2014 appointing his parents as co-guardians.[5] (*Id.*). The state court entered a full guardianship order—meaning that ████ could not purchase a car or open a bank account, as he had no legal authority to make such decisions on his own. All such decisions were now committed to his legal guardians. *See* N.J.S.A. 3B:12-24.1.

After reviewing the guardianship order and related documentation, the Court proceeded to address ████'s competency to move forward in this criminal case. The Government agreed that a competency evaluation was appropriate. After further status proceedings and briefings on the legal

---

[3] The Diagnostic and Statistical Manual of Mental Disorders classifies intellectual disabilities by severity into four categories: mild, moderate, severe and profound. *Am. Psychiatric Ass'n., Diagnostic and Stat. Manual of Mental Disorders* (5th Ed. Rev. 2025). Thus, ████'s diagnosis is the most extreme degree of intellectual disability.

[4] It is worth noting that ████ did not attend his own competency hearing because, according to his appointed counsel, doing so would make him nervous and anxious and likely confuse and upset him. (*In the Matter of* ████████████ No. CP-0310-2013).

[5] Following the death of ████'s father in 2018, ████'s mother became his sole legal guardian. (████ 22-mj-11073, ECF No. 80 at 2).

effect of the state court's declaration of incapacitation and grant of full guardianship on ▮'s competency in this Court and ability to enter into a plea agreement,[6] (*see* ▮ 22-mj-11073, ECF Nos. 81–82), the parties agreed on Dr. Peter Oropeza[7] as evaluator, and on December 1, 2023, the Court formally ordered a competency evaluation under § 4241, (*Id.* at ECF Nos. 29–30). Dr. Oropeza completed his report in March 2024, concluding that ▮ "does not present as competent to stand trial" and "is not ever likely to gain competency." (*Id.* at ECF No. 44-2 at 13–14).

Specifically, Dr. Oropeza based his conclusion on a February 23, 2024 outpatient evaluation of ▮ a contemporaneous interview with ▮'s mother, an interview with his treating psychologist, and a review of substantial collateral records, including DDD materials, guardianship records, a 2012 IEP and associated psychological testing, and 2017 psychiatric records from Trinitas. (*Id.* at 2). The report described ▮ as presenting in a markedly childlike manner, with poor recall, limited eye contact, impaired concentration, and serious difficulty understanding even basic aspects of his legal situation. (*Id.* at 3–4). It further noted that he required reminders even for basic activities of daily living and reported sleeping with a Barbie doll he described as his girlfriend and "treat[ing] . . . like a real girl." (*Id.*)

---

[6] As the parties outlined in their briefing, guardianship and federal competency are related but distinct legal concepts, and the state adjudication is therefore not dispositive here. It is, however, one relevant consideration among others in the Court's assessment of ▮'s present functioning and competency in this proceeding. (*See* ▮ 22-mj-11073, ECF Nos. 81–82).

[7] By way of background, Dr. Oropeza is a licensed clinical and forensic psychologist with a master's degree and doctorate in clinical psychology, earned in 2000, and a specialization in neuropsychology. (▮ 23-mc-00024, ECF No. 9 at 9). He reported that he received formal training in competency assessments during an APA-approved forensic-hospital internship, later served on the competency unit at North Texas State Hospital, and was the Chief Psychologist on that unit for two years. (*Id.* at 9–10). He has conducted well over a thousand competency-to-stand-trial evaluations and has also had prior experience working at the Bureau of Prisons ("BOP"), including a year as a clinical psychologist at Fort Dix after completing his doctorate. (*Id.* at 10, 13–15).

Dr. Oropeza explained that ██'s impairments were first recognized in early childhood, that he had long required special-education services, and that prior testing showed significant cognitive deficits, including a full-scale IQ of 66, with especially severe deficits in working memory and processing speed. (*Id.* at 4–7). In practical terms, a full-scale IQ of 66 means ██'s score was higher than only about one percent of similarly aged test-takers; put differently, about 99 out of 100 similarly aged peers would be expected to score higher. (*Id.* at 5). The report characterized that full-scale score as "Extremely Low." (*Id.*).

The report further recounted a longstanding history of autism and related neurodevelopmental impairments, along with additional psychiatric concerns reflected in later records, including obsessive-compulsive symptoms, anxiety, depression, ADHD, intellectual disability, and schizoaffective disorder. (*Id.* at 9–11). In Dr. Oropeza's view, those conditions are chronic, well-documented, and directly impair ██'s cognition, social functioning, and emotional functioning; because the prior testing was already comprehensive and the condition would not improve, he concluded that further testing was not clinically warranted. (*Id.* at 12–13). The report therefore opined that ██ lacks both a rational and factual understanding of the proceedings and the ability to consult with counsel with a reasonable degree of rational understanding, is not malingering, and should instead continue psychological and psychiatric treatment to maintain what is likely his highest level of functioning, with long-term group-home placement considered. (*Id.* at 13–14).

Based on Dr. Oropeza's findings, the Court raised at a subsequent status conference on April 2, 2024 the broader question of how this case could proceed consistent with due process. (██ 23-mc-00024, ECF No. 5). After the parties were unable to reach an agreement, the Court ordered at a July 24, 2024 status conference that the Government either advise by September 10,

6

2024 that it would dismiss the case under Federal Rule of Criminal Procedure 48(a), or submit a letter brief by September 3, 2024 explaining why the continued prosecution did not violate ▮▮'s due process rights in light of his intellectual disabilities.[8] (*Id.* at ECF No. 6).

The Government filed its initial response on September 3, 2024. (▮▮ 22-mj-11073, ECF No. 44). In that submission, it urged the Court to hold a competency hearing under 18 U.S.C. §§ 4241(c) and 4247(d), and maintained that, if ▮▮ were found incompetent, § 4241(d) required commitment to the custody of the Attorney General for hospitalization to assess restorability. (*Id.* at 2). It also argued that § 4241(d) is constitutional even where a defendant may ultimately prove unrestorable, and that dismissal of the case would not be warranted even after a finding of permanent incompetency. (*Id.* at 4–9).

▮▮ filed his response on October 15, 2024. (*Id.* at ECF No. 80). His submission emphasized the depth and duration of his developmental and psychiatric impairments, relied heavily on Dr. Oropeza's conclusion that he was not competent and not likely ever to gain competency, and argued that mandatory commitment under § 4241(d) would violate due process as applied to him because restoration was impossible and confinement would be unduly disruptive and only cause regression and harm. (*Id.* at 8–19). He also contended that, if any further evaluation

---

[8] The Court also ordered the parties to address whether the continuation of ▮▮'s restrictive bail conditions raised similar constitutional concerns. Although that question was raised during the course of the proceedings, and the Court lessened such restrictions to a large degree, (*see* ▮▮ 22-mj-11073, ECF Nos. 26, 28, 32), it is not the issue presently before the Court. At this stage, the Court is concerned with the distinct question of whether committing ▮▮ to the custody of the Attorney General under § 4241(d) would violate due process in light of his particular circumstances.

was necessary, it should occur on an outpatient basis rather than through BOP hospitalization.[9]
(*Id.* at 19–23).

The Government replied on October 25, 2024. (*Id.* at ECF No. 48). In that reply, it reiterated its request that the Court hold a competency hearing and, if ▮ were found incompetent, order his commitment to the custody of the Attorney General under § 4241(d). (*Id.* at 5). The Government further argued that the Court lacked discretion to order an outpatient restoration evaluation in lieu of statutory commitment. (*Id.* at 2).

The Court ultimately held a competency hearing on March 24, 2025, at which Dr. Oropeza testified credibly and consistently with his report. (▮ 23-mc-00024, ECF No. 9). Specifically, Dr. Oropeza testified that, based on his interview of ▮ and his review of the collateral records, ▮'s diagnoses were autism, pervasive developmental disorder, ADHD, intellectual disability, and schizoaffective disorder. (*Id.* at 16). He further testified that ▮'s pervasive developmental disorder manifested in toddlerhood, that pervasive developmental disorder and autism are conditions a person is born with and for which there is no cure, and that, in his opinion, ▮ "won't get any better." (*Id.* at 19–21). Dr. Oropeza also emphasized that his opinion that ▮ was not likely to ever gain competency was a rare opinion for him to make in his practice and was specific to ▮'s particular combination of diagnoses, their severity, and their chronicity. (*Id.* at 25–27, 66).

---

[9] In addition to his constitutional arguments, ▮ contends that mandatory inpatient commitment under § 4241(d) would violate Section 504 of the Rehabilitation Act, as informed by *Olmstead v. L.C. ex rel. Zimring*, because it would require institutional placement rather than treatment in the most integrated setting appropriate to his needs. (▮ 22-mj-11073, ECF No. 80 at 23–29). The Court does not address that argument because it concludes that commitment under § 4241(d) is unconstitutional as applied to ▮ on due process grounds.

Dr. Oropeza further testified that there was no available treatment, in BOP custody or otherwise, that could improve ██'s cognitive functioning or neurodevelopmental conditions to the point of changing his competency, because ██'s cognitive limitations had been "consistent across many assessments" and were "not going to change." (*Id.* at 51). And while Dr. Oropeza made clear that he does not equate an autism or intellectual-disability diagnosis with incompetence as a general matter, he emphasized that ██ had "never been legally competent" and testified that, in his own professional experience, he had never seen someone with impairments as severe as ██'s attain or be restored to competency.[10] (*Id.* at 51–52).

The hearing record also established how dependent ██ remains on outside structure and support, including his mother and treating psychologist. (*Id.* at 63–64). Dr. Oropeza testified that ██ appeared stable in his current environment where he lives with his mother and that significant changes in environment, such as incarceration in another state at a BOP facility, could be destabilizing for someone with his combination of conditions. (*Id.* at 21–23). He also testified that, based on his personal experience, incarceration was not clinically necessary because there is nothing from an assessment perspective that could not be done in an outpatient setting. (*Id.* at 60–63). Despite this unrefuted testimony, the Government refused to consider less intrusive alternatives. (*See* ██ 22-mj-11073, ECF No. 65 at 5).

---

[10] While the Government argues in its post-hearing submission that Dr. Oropeza testified ██ may gain competency, (██ 22-mj-11073, ECF No. 65 at 1), that overstates the record. Dr. Oropeza's actual testimony was that there was a "[v]ery, very, very, very slim possibility" that ██ could gain competency. (██ 23-mc-00024, ECF No. 9 at 42–43). That caveat does not amount to affirmative evidence that ██ is restorable within the meaning of § 4241(d). A clinician's refusal to say "never" is not the same thing as evidence of a substantial probability of attaining competency in the foreseeable future. Read fairly and as a whole, Dr. Oropeza's testimony was that ██ has never been competent and that will not change.

9

Following the hearing, the parties submitted supplemental briefing on May 8, 2025. (*Id.* at ECF Nos. 64–65). In its post-hearing submission, the Government urged the Court to find ▮ presently incompetent but nevertheless to follow what it characterized as the mandatory command of § 4241(d) by committing him to the custody of the Attorney General for up to four months to assess restorability, or at minimum for a 45-day dangerousness evaluation; in the alternative, it asked the Court to keep the competency hearing open and revisit its earlier denial of ▮'s request for a second opinion.[11] (▮ 22-mj-11073, ECF No. 65). ▮'s submission, by contrast, argued that Dr. Oropeza's testimony reinforced what the record had long shown: that ▮'s impairments are lifelong, profound, and not susceptible to restoration, such that commitment to BOP custody would serve no legitimate restorative purpose and would instead violate his constitutional rights by inflicting further harm. (*Id.* at ECF No. 64). Accordingly, ▮ urged that the only disposition consistent with due process is dismissal of the complaint. (*Id.* at 7; *see also* ▮ 22-mj-11073, ECF No. 85 at 8).

The Court then held a status conference on April 1, 2026 to address the procedural consequences if the Court denied the Government's request for commitment under § 4241(d), including whether any charging document would remain operative, whether pretrial conditions could lawfully continue, and whether the Government would seek indictment. (*Id.* at ECF No. 85 at 8–10). In response to the Court's questions, the Government maintained that, if its request for commitment were denied, the complaint would remain an active charging document and could

---

[11] To be clear, ▮ reserved the right to contest the competency evaluation report and/or retain his own expert. (▮ 22-mj-11073, ECF Nos. 29–30). The Government reserved no comparable right, and the Court therefore rejects its attempt to rely on ▮'s reservation as a basis for seeking its own additional evaluation. *See, e.g., United States v. Alhindi*, 97 F.4th 814, 824 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 1100 (2025) (explaining that it is within the discretion of a district court to order multiple competency evaluations).

continue to support pretrial release conditions; that any future trial or adjudication would require either an indictment or a waiver of indictment; and that, if the Court dismissed the complaint, the Government would likely seek either to have the information lodged to facilitate an appeal or to present the case to a grand jury and seek an indictment. (*Id.* at 10–13; *see also* ███ 22-mj-11073, ECF No. 44 at 8–9). The Court and defense counsel then expressed serious concern over the propriety of seeking to indict a defendant whom the Government conceded was incompetent.[12] (*Id.* at ECF No. 85 at 13–15). The Court, however, reserved decision on that issue, stating that it was "a question for another day" if the Government chose to proceed in that manner. (*Id.* at 16). The Court thereafter issued its ruling on the record, denying the Government's request for commitment and explaining that a written opinion would follow. (*Id.* at 16–21). This Opinion accompanies that ruling.

## II.      LEGAL STANDARD

### A.      § 4241(d)

The criminal trial of a defendant who lacks mental competency violates the defendant's due process right to a fair trial. *See Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (citations omitted); *United States v. Renfroe*, 825 F.2d 763, 765–66 (3d Cir. 1987) (citing *Drope v. Missouri*,

---

[12] Additionally, the Court notes that, under Federal Rule of Criminal Procedure 7(b), an information has no force absent a valid waiver of indictment , and no such waiver is possible from an incompetent defendant. The only operative charging instrument, then, is the Complaint filed under Federal Rule of Criminal Procedure 3. Ordinarily, when a criminal case is initiated by complaint, an indictment or information must be filed within thirty days of arrest. *See* 18 U.S.C. § 3161(b). That did not occur here and, absent valid tolling or continuances, would ordinarily require dismissal. To the extent the Government contends it could still seek an indictment before expiration of the latest continuance through April 30, 2026, that position would raise substantial questions, including whether continuances entered while ███ was incompetent are effective for Speedy Trial Act purposes. And any further effort to seek an indictment in light of the record in this case—including the Government's concession that ███ is incompetent and the evidence showing no meaningful prospect of restoration—would present serious concerns.

11

420 U.S. 162, 172 (1975); *see also Godinez v. Moran,* 509 U.S. 389, 398–99 (1993) (holding that standards for competency to plead guilty and to stand trial are the same). The basic standard for competency, as set forth by the Supreme Court in *Dusky v. United States*, requires that a defendant have a rational and factual understanding of the proceedings, and a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" to stand trial. 362 U.S. 402, 402 (1960) (per curiam); *see also Taylor v. Horn*, 504 F.3d 416, 430 (3d Cir. 2007) (citing *Dusky*, 362 U.S. at 402). Requiring a criminal defendant to "be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez*, 509 U.S. at 402.

Congress codified this competency standard in § 4241(d), which provides that:

If, after the [competency] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—
     (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and
     (2) for an additional reasonable period of time until—
     (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or
     (B) the pending charges against him are disposed of according to law;
whichever is earlier.

The government has the burden of proving that a defendant is competent to stand trial. *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989) (citation omitted). Pursuant to § 4241, psychiatric or psychological examinations of the defendant may be conducted, psychiatric or psychological reports may be prepared, and a hearing is held. § 4241(b)–(c). In determining

12

whether a defendant is competent to stand trial, "court[s] must examine the unique circumstances of the case and decide whether the defendant '(1) has the capacity to assist in her or his own defense and (2) comprehends the nature and possible consequences of a trial.'" *United States v. Jones*, 336 F.3d 245, 256 (3d Cir. 2003) (citations omitted). A number of factors may be considered, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Id.* (quoting *United States v. Leggett*, 162 F.3d 237, 242 (3d Cir. 1998)). Another factor that courts deem relevant is "an attorney's representation about his client's competency." *Id.* (citations omitted). There is "no predetermined formula" for competency determinations; each case will depend on the facts presented. *Leggett*, 162 F.3d at 242. Even one factor alone may be sufficient in certain circumstances. *Jones*, 336 F.3d at 256 (citations omitted).

### B.    Due Process

The Due Process Clause contains both substantive and procedural components. *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (citations omitted). Procedural due process concerns the fairness of the decision-making process—that is, the notice, hearing, and procedures the government must provide before depriving a person of liberty or property. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Substantive due process, by contrast, "limits what government may do regardless of the fairness of procedures that it employs," *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000), and protects against government power "arbitrarily and oppressively exercised," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

Within substantive due process doctrine, courts distinguish between challenges to legislative action and challenges to non-legislative action. *Nicholas v. Pa. State Univ.*, 227 F.3d

13

133, 139 (3d Cir. 2000). Challenges to non-legislative action generally allege that executive or administrative conduct is arbitrary, irrational, improperly motivated, or so egregious that it "shocks the conscience." *Id*. (citations omitted). Challenges to legislative action, by contrast, concern whether a law or rule of general applicability impermissibly burdens a protected liberty interest or lacks a sufficient relation to a legitimate governmental objective. *Id.* (citations omitted). As the Third Circuit has explained, non-legislative acts "typically apply to one person or to a limited number of persons," whereas legislative acts include "laws and broad executive regulations [that] apply to large segments of society." *Id.* at 139 n.1 (citations omitted).

A substantive due process challenge to legislative action may be either facial or as applied. A facial challenge attacks "a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *LoPresti v. Johnson*, No. 22-1435, 2023 WL 6890732, at *4 (3d Cir. Oct. 19, 2023) (citing *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)). An as-applied challenge, by contrast, "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Marcavage*, 609 F.3d at 273 (citation omitted).

When evaluating a substantive due process challenge to legislative action as applied, the court must first determine the applicable level of scrutiny. Three levels of scrutiny are potentially available: rational basis review, intermediate scrutiny, and strict scrutiny. *Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (citing *United States v. Marzzarella*, 614 F.3d 85, 95–99 (3d Cir. 2010)). Under rational basis review, the Court "presumes the law is valid and asks only whether the statute is rationally related to a legitimate state interest." *Marzzarella*, 614 F.3d at 95–96 n.13 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). At the other end of the spectrum

is strict scrutiny, which demands that the statute be "narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (citations omitted). In between is intermediate or heightened scrutiny, under which the government's asserted interest must be more than just legitimate but need not be compelling. It must be "significant, substantial, or important." *Marzzarella*, 614 F.3d at 98 (quotation marks and citations omitted). Additionally, "the fit" between the asserted interest and the challenged law need not be "perfect," but it must be "reasonable" and "may not burden more [conduct] than is reasonably necessary." *Id*. (citations omitted).

Under that framework, ███'s claim is best characterized as an as-applied substantive due process challenge to legislative action. He does not principally contend that the Government denied him adequate process; he contests the Government's authority to subject him to confinement under § 4241(d) at all. The challenged action is legislative because the asserted injury flows from the mandatory operation of a federal statute of general applicability, not from a discrete executive decision directed only at him. And the claim is as applied because ███ does not argue that § 4241(d) is invalid in every case, but only that its application to him is unconstitutional given the particular facts of his condition and prognosis.

Although the Supreme Court has not definitively specified the standard of review for involuntary commitment statutes, *Jackson v. Indiana* makes clear that such confinement is subject to more than ordinary rational-basis review. In *Jackson*, the Court held that the nature and duration of commitment must bear a "reasonable relation" to the purpose of confinement. 406 U.S. 715, 738 (1972). Courts have read that requirement to imply heightened scrutiny. *See, e.g., Foucha v. Louisiana*, 504 U.S. 71, 126 n.15 (1992); *Hickey v. Morris*, 722 F.2d 543, 546 (9th Cir. 1983);

*United States v. Sahhar*, 917 F.2d 1197, 1201 (9th Cir. 1990); *Ernst J. v. Stone*, 452 F.3d 186, 200–01 (2d Cir. 2006).

That conclusion is reinforced by the liberty interest at stake. Rational-basis review applies only where the challenged law does not burden a fundamental liberty interest. *See LoPresti*, 2023 WL 6890732, at *4 (quoting *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014)). Section 4241(d) burdens precisely such an interest, because "[t]here is a substantive liberty interest in freedom from confinement," *United States v. Perry*, 788 F.2d 100, 112 (3d Cir. 1986), and "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Court therefore concludes heightened scrutiny applies and that § 4241(d), as applied to ▇▇▇ must be reasonably related to the achievement of an important governmental interest.

## III.    DISCUSSION

The Court proceeds in three steps. First, it finds that ▇▇▇ is presently incompetent to stand trial under § 4241(a), a point the Government does not dispute. Second, it considers whether § 4241(d)'s otherwise mandatory commitment procedure may constitutionally be applied on the specific facts presented here—namely where the defendant never possessed, and therefore can never attain, competency to stand trial—and ultimately concludes that mandatory inpatient commitment under § 4241(d), as applied here, violates due process. Third, the Court turns to the consequences of that conclusion and explains why, although mandatory inpatient detention is unconstitutional as applied here, due process does not necessarily foreclose further proceedings employing some less restrictive alternatives and will afford the Government an opportunity to consider such alternatives prior to dismissal of the charges.

16

**A.     ████ is Incompetent to Stand Trial**

The Court easily finds by a preponderance of the evidence that ████ is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of these proceedings and to assist properly in his defense. *See* § 4241(a). There is no real dispute on that point. Dr. Oropeza concluded in his March 2024 report that ████ was not competent to stand trial, (████ 22-mj-11073, ECF No. 44-2), and he reaffirmed that opinion at the competency hearing, (████ 23-mc-00024, ECF No. 9). The Government, for its part, has not argued otherwise; to the contrary, in its post-hearing submission it expressly asked the Court to find ████ presently incompetent and then proceed under § 4241(d). (████ 22-mj-11073, ECF No. 65 at 1).

The Court's conclusion that ████ is incompetent is also well supported by the record. As set forth above, Dr. Oropeza based his opinion on an outpatient evaluation of ████ interviews with ████'s mother and treating psychologist, and extensive collateral materials, including DDD, guardianship, educational, and psychiatric records. (*Id.* at ECF No. 44-2 at 2). Those sources reflected profound and longstanding deficits in cognition, social functioning, and emotional functioning dating back to early childhood. Dr. Oropeza explained both in his report and at the hearing that ████'s diagnoses—including autism, pervasive developmental disorder, ADHD, intellectual disability with an IQ score of 66, and schizoaffective disorder—substantially impair his ability to understand the proceedings and to consult with counsel with a reasonable degree of rational understanding. (████ 22-mj-11073, ECF No. 44-2 at 11–12; ████ 23-mc-00024, ECF No. 9 at 19, 26). The Court credits that opinion.

Additionally, the Court's own observations in this case are consistent with Dr. Oropeza's assessment. When the matter first came before the Court for a plea hearing, it became readily

17

apparent that there were serious concerns as to whether ███ understood the proceedings at all. The later-produced guardianship records, the evaluation report, and the hearing testimony only confirmed what the Court had already begun to suspect: ███'s impairments are chronic, pervasive, and of a nature that prevent him from meeting the modest competency requirements set out in *Dusky*. The Court therefore finds that ███ is presently incompetent to stand trial. Because the Court finds ███ presently incompetent, it must next address whether § 4241(d)'s mandatory commitment procedure may constitutionally be applied to him on this record.

**B.      Mandatory Detention Under § 4241(d), As Applied Here, Violates Due Process**

As an initial matter, the broader question of whether § 4241(d)'s mandatory commitment language comports with due process generally appears to be one of first impression in the Third Circuit. *See United States v. Reese,* No. 18-39, 2018 WL 4854660, at *6 (E.D. Pa. Oct. 5, 2018). However, the Court need not resolve that broader issue here. Instead, it addresses the narrower as-applied substantive due process challenge presented: whether § 4241(d) may constitutionally require the inpatient commitment of a defendant whose impairments are congenital, chronic, and lifelong, who has never been competent to stand trial, and who cannot attain the competency contemplated by the statute. For the reasons set forth below, the Court concludes that mandatory inpatient commitment in these circumstances fails heightened scrutiny because it is not reasonably related to the achievement of the Government's asserted interest of evaluating restorability. The Court begins with the text and purpose of § 4241(d), then explains why mandatory commitment is not reasonably related to that purpose as applied here, and finally addresses the Government's counterarguments.

Section 4241(d) provides, in relevant part, that if a defendant is found incompetent, "the court shall commit the defendant to the custody of the Attorney General." § 4241(d). The Attorney

18

General must then "hospitalize the defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." § 4241(d)(1). Although the Government reads that language as mandatory in every case, the Court must evaluate that text within the substantive due process framework described above. *See* Section II.B, *supra.* Because § 4241(d), as applied here, burdens ███'s fundamental liberty interest in freedom from confinement, the question is not merely whether Congress used mandatory language, but whether mandatory commitment in these circumstances is reasonably related to the achievement of an important government interest.

That inquiry is informed by the fact that § 4241(d) was enacted against the backdrop of *Jackson*, and courts have recognized that Congress deliberately tracked *Jackson*'s due process framework when it adopted the current statute. *See United States v. Shawar*, 865 F.2d 856, 864 (7th Cir. 1989) ("Congress clearly was aware of the Court's decision in *Jackson*, and echoed its language in § 4241(d)."); *United States v. Donofrio*, 896 F.2d 1301, 1302 (11th Cir. 1990) (§ 4241(d) "was passed in response to the Supreme Court decision in *Jackson*."); *United States v. Filippi*, 211 F.3d 649, 652 (1st Cir. 2000) (§ 4241(d) "is self-evidently built upon *Jackson*."); *United States v. Strong*, 489 F.3d 1055, 1061 (9th Cir. 2007) ("§ 4241(d) was enacted in response to the *Jackson* decision and echoed *Jackson*'s language."). *Jackson* established the constitutional limits that govern incompetency-based commitment in the context of an Indiana statute that required what was, in substance, indefinite detention. The defendant there, Theon Jackson, was a "mentally defective deaf mute with a mental level of a pre-school child." 406 U.S. at 717. He could not read, write, or otherwise communicate except through limited sign language, and the record showed that the likelihood he would ever become competent was "at best minimal, if not

19

nonexistent." *Id.* at 717, 727. The record also rebutted any suggestion that commitment could contribute to his improvement. *Id.* at 727. Against that backdrop, the Supreme Court held that Indiana could not constitutionally commit Jackson "for an indefinite period simply on account of his incompetency to stand trial on the charges filed against him," and announced the due process rule that still governs today: "the nature and duration of commitment [must] bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 720, 738. A defendant committed solely because he cannot proceed to trial therefore "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.* at 738.

Courts interpreting § 4241(d) have repeatedly recognized that, consistent with *Jackson*, the purpose of § 4241(d)'s initial commitment period is to determine whether there is a substantial probability that the defendant can be restored to competency in the foreseeable future. *See, e.g., Strong*, 489 F.3d at 1062 ("[T]he overarching purpose of commitment under § 4241(d) is to enable medical professionals to accurately determine whether a criminal defendant is restorable to mental competency.") (emphasis added); *Donofrio*, 896 F.2d at 1303 ("Once the district court decides that a defendant is incompetent to stand trial, it is appropriate that he be hospitalized for a careful determination of the likelihood of regaining mental capacity to stand trial. The due process requirements of *Jackson* are met because the statute itself requires that the period of commitment be 'reasonable' for that purpose.") (emphasis added); *see also United States v. Brennan*, 928 F.3d 210, 214 (2d Cir. 2019) ("The Supreme Court's decision in *Jackson* therefore mandates that . . . the defendant's commitment must at all times reasonably relate to evaluating his ability to regain competency or to restoring him to competency through treatment.") (emphasis added); *Report of the Proceedings of the Judicial Conference of the United States* at 11 (Mar. 11, 2025) ("Under 18

20

U.S.C. §§ 4241–4248, the Attorney General is required to hospitalize in a suitable facility a defendant whom the court has determined to be mentally incompetent to stand trial, and to conduct an evaluation of the potential for <u>restoring competency</u> within four months, to be followed by restoration treatment for those whose conditions are amenable to treatment.") (emphasis added).[13] Indeed, the Government's own briefing embraces that understanding, stating that the procedures set forth in § 4241(d) are designed to "determin[e] a defendant's restorability."[14] (████ 22-mj-11073, ECF No. 44 at 6).

Where, as here, the credited and unrefuted evidence shows that ████'s impairments are congenital, chronic, and lifelong—and that he has never been competent to stand trial—commitment cannot serve the statute's restorative purpose. Stated differently, competency cannot be restored where the record establishes that the defendant has never possessed it in the first place. At that point, the fit between the Government's asserted interest and § 4241(d)'s mandatory

---

[13] The Court notes that, in March 2025, the Judicial Conference of the United States observed that longstanding delays in competency hospitalization were driven primarily by insufficient bedspace in suitable BOP facilities. *Report of the Proceedings of the Judicial Conference of the United States* at 11 (Mar. 11, 2025). In response, the Committee on Criminal Law agreed to seek amendments to § 4241(d) that would make commitment to BOP custody for the purposes of evaluating restorability and providing restoration treatment optional rather than mandatory and permit evaluations and treatment to be furnished by local community providers. *Id.* Although that recommendation does not control the constitutional question presented here, it underscores two points relevant to this case: first, that § 4241(d) is understood in practice as a restorability-and-treatment provision; and second, there is indeed a consensus that inpatient hospitalization in BOP custody is not the only conceivable and effective means of carrying out those functions.

[14] To the extent the Government invokes dangerousness as an additional justification for commitment, that concern is addressed by different statutory provisions—namely, 18 U.S.C. §§ 4246 and 4248—which it cites. (*See* ████ 22-mj-11073, ECF No. 44 at 7, ECF No. 65 at 6). But those statutes govern separate forms of commitment and do not alter the limited restorative purpose of § 4241(d). The question under *Jackson* is whether the commitment authorized by § 4241(d) bears a reasonable relation to the purpose of that statute, not whether the Government may have some other objective it would like to pursue through a different statutory scheme. The Government cannot expand § 4241(d)'s restorative purpose by importing into it the dangerousness inquiries that Congress addressed elsewhere.

detention breaks down and applying § 4241(d) to ▮ would burden far more liberty than reasonably necessary to advance the statute's legitimate aim.

The statute's text reinforces the same conclusion. Section 4241(d) does not merely require that a defendant be taken into custody; it directs the Attorney General to "hospitalize the defendant for <u>treatment</u> in a suitable facility"[15] to determine whether he may attain competency. § 4241(d) (emphasis added). And in ordinary medical usage, "treatment" means the management and care of a condition to "prevent, cure, ameliorate, or slow progression" of that condition.[16] *Treatment*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/treatment (last visited Mar. 26, 2026). That language presupposes a condition susceptible to therapeutic intervention—one that can, in some meaningful respect, be managed, improved, or altered. But as set forth above, ▮'s impairments are congenital, chronic, and lifelong; they are not the sort of condition that can be medically managed, improved, or altered in a way that would enable him to attain competency. He therefore does not fall within the statute's contemplated class of defendants for whom hospitalization may be ordered "for treatment." The provision therefore does not fit ▮'s circumstances for the independent reason that its own terms presuppose the possibility of treatment and restoration, neither of which exists here.

---

[15] The Court separately notes that § 4247(a)(2) defines a "suitable facility" as "a facility that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant." § 4247(a)(2). The Court need not definitively resolve that separate statutory requirement here. It notes, however, that the record raises substantial doubt whether that requirement could be satisfied on these facts. Dr. Oropeza testified that ▮ is stable in his current environment, depends heavily on outside structure and support, and could be destabilized by a significant change in environment, including incarceration or hospitalization in BOP custody. (▮ 23-mc-00024, ECF No. 9 at 21–23). In light of that undisputed evidence, the Court has serious concerns whether the type of custodial hospitalization contemplated by § 4241(d) would qualify as a "suitable facility" for this particular defendant.

[16] Because Congress did not define "treatment," the Court gives that term its ordinary meaning. *See Tanzin v. Tanvir*, 592 U.S. 43, 48–49 (2020).

The Government advances two principal arguments for why § 4241(d) does not offend due process: first, that the statute's limited duration is enough to satisfy constitutional requirements; and second, that out-of-circuit decisions upholding the provision confirm its validity.

First, the Government argues that § 4241(d) satisfies due process because it provides for only a limited period of hospitalization and is therefore "inherently limited." (*See* ▮ 22-mj-11073, ECF No. 44 at 5). In the ordinary case, a four-month outer limit may preserve a reasonable fit between confinement and the Government's interest in assessing restorability. But that is not this case. Where the record already establishes that there is no substantial probability the defendant will attain competency in the foreseeable future, even a facially time-limited commitment is not reasonably related to that interest as applied. *Jackson* confirms as much: a defendant committed solely on account of incompetence may not be held longer than the reasonable period necessary to determine whether there is a substantial probability that he will attain competency in the foreseeable future. 406 U.S. at 738. Here, no period of detention is reasonably necessary to answer that question. The credited evidence is not that ▮ might attain competency with time, treatment, or further observation, but that he has never been competent and never will be. On this record, then, even a limited commitment under § 4241(d) would exceed the "reasonable period of time necessary" permitted by *Jackson*.

Second, the Government relies on out-of-circuit authority and asserts that "every court to consider these statutory procedures has held that they comport with the Due Process Clause." (▮ 22-mj-11073, ECF No. 44 at 5–8). But the cited cases involved materially different circumstances. Each concerned a defendant with a condition—such as alcoholism, grandiose and persecutory delusional disorder, dementia, stroke, depression, anxiety, or epilepsy—for which restorability at least remained a live question. *See Strong*, 489 F.3d at 1058 (alcoholism); *United*

*States v. McKown*, 930 F.3d 721, 724 (5th Cir. 2019) (grandiose and persecutory delusional disorder); *Filippi*, 211 F.3d at 650 (vascular dementia); *United States v. Ferro*, 321 F.3d 756, 758 (8th Cir. 2003) (dementia and stroke); *Donofrio*, 896 F.2d at 1302 (unspecified condition); *Brennan*, 928 F.3d at 212 (alcoholism); *United States v. Dalasta*, 856 F.3d 549, 551 (8th Cir. 2017) (depression, anxiety, and epilepsy); *Reese*, 2018 WL 4854660, at *2 (major neurocognitive disorder, including possible Alzheimer's and vascular dementia). None involved a defendant like █████ whose impairments are congenital, chronic, and lifelong, and who has never been competent at any point in his life. For that reason, those decisions do not control the as-applied question presented on this record.

Indeed, the only case the Court has identified with arguably similar facts is *Shawar*, but that case is still materially different. There, decided in 1989, the defendant was described as having "borderline mental retardation" and a full-scale IQ of 71. *Shawar*, 865 F.2d at 858. But that case did not involve the same combination of congenital, chronic, and overlapping developmental and psychiatric impairments present here, nor was there any record evidence that the defendant had never been competent and never would be. Considering these differences and given the age of *Shawar* and the substantial societal evolution since then in the clinical understanding of individuals with intellectual disabilities and mental-health conditions, the Court finds its persuasive value limited.

In short, the cases cited by the Government addressed the ordinary § 4241(d) scenario—where restorability remained at least a live question subject to reasonable debate, or where further inpatient evaluation could plausibly serve to clarify diagnosis or rule out malingering. They do not answer the as-applied question presented here: whether mandatory commitment is reasonably related to the government's interest in "restoration" where the defendant has never possessed the

24

competency that term necessarily implies once existed. For that reason, those cases are inapposite and do not undermine the Court's conclusion that applying § 4241(d)'s mandatory detention provision to ▮ would violate substantive due process.

### C.    Due Process Bars Mandatory Inpatient Commitment Here, but the Court Does Not Foreclose Less Intrusive Alternatives

To be clear, the Court's holding is narrow. The Court concludes only that mandatory inpatient commitment under § 4241(d) of a defendant who has never been competent, and therefore cannot have competency restored, violates due process as applied. On this record, such confinement fails heightened scrutiny because it does not bear a reasonable relation to the statute's purpose of restoring ▮ to competency for trial. It also cannot be justified as a reasonable period necessary to determine restorability, where the unrebutted evidence shows that further inpatient hospitalization is not medically necessary to answer that question. That conclusion does not end the matter entirely, however, because the governing due process inquiry turns not only on how long the Government may confine an incompetent defendant, but also on whether the particular form of confinement it seeks is sufficiently justified in light of its stated objective. *See Jackson,* 406 U.S. at 738 ("[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."). And on that point, *Sell v. United States* is instructive by analogy.

While *Sell* is not directly on point as it involved the involuntary administration of antipsychotic medication to a mentally ill defendant to render him competent to stand trial, 539 U.S. 166, 179 (2003), its reasoning is nevertheless informative. Specifically, *Sell* and *Jackson* address the same core question: what due process permits when the government seeks to impose

25

substantial restraints on the liberty of an incompetent defendant to make trial possible.[17] For that reason, although *Sell* does not control the issue presented here, its application of heightened scrutiny and emphasis on trial-related necessity and less intrusive alternatives is relevant by analogy.

Specifically, *Sell* recognized that involuntary measures imposed on an incompetent defendant to advance the Government's trial-related interests are constitutionally permissible only if they satisfy a demanding, multi-part test. *Id.* at 180–83. First, the court must find that important governmental interests are at stake, while also considering case-specific circumstances that may lessen the force of those interests. *Id.* at 180. Second, the court must conclude that the involuntary measure is substantially likely to render the defendant competent to stand trial and substantially unlikely to produce side effects that would interfere significantly with the defendant's ability to assist counsel, thereby undermining the fairness of the trial. *Id.* at 181. Third, the court must determine that the measure is necessary to further those interests, meaning that less intrusive alternatives are unlikely to achieve substantially the same result. *Id.* Fourth, the court must find that the proposed intervention is medically appropriate—that is, in the defendant's best medical interest in light of his condition. *Id.* In short, *Sell* makes clear that when the Government seeks to impose an involuntary measure in order to make trial possible, due process demands the Court

---

[17] Additionally, the Court finds *Sell* to be relevant here because the Supreme Court has recognized that both involuntary commitment and unwanted administration of antipsychotic drugs implicate significant constitutionally protected liberty interests, *Jones v. United States*, 463 U.S. 354, 361 (1983) (citation omitted) (recognizing that commitment for any purpose is a significant deprivation of liberty that requires due process protection); *Washington v. Harper*, 494 U.S. 210, 221–22 (1990) (citations omitted) (recognizing a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs), and indicated that some form of heightened scrutiny is therefore appropriate, *Witt v. Dep't of Air Force*, 527 F.3d 806, 818 (9th Cir. 2008) (referring to *Sell* as an application of heightened scrutiny); *Foucha*, 504 U.S. at 126 n. 15 (referring to *Jackson* as implying heightened scrutiny).

give careful attention to whether the measure is actually capable of advancing an important governmental interest, whether it is necessary in light of available alternatives, and whether it is appropriate in light of the defendant's condition.

Those same considerations are highly relevant here under the Court's as-applied due process analysis. Here, although the Government plainly has an important interest in prosecuting a serious criminal charge, the present record does not permit the Court to find that involuntary inpatient commitment is reasonably related to achieving that interest in █████'s case. Specifically, the record does not permit the Court to find that inpatient commitment is substantially likely to render █████ competent, substantially unlikely to produce consequences that would interfere with the fairness of the proceedings, necessary in light of less intrusive alternatives, or medically appropriate in light of his particular condition. To the contrary, Dr. Oropeza testified that █████ has never been competent and is not likely ever to attain competency, that inpatient hospitalization would likely be destabilizing, that inpatient hospitalization was not medically necessary for further assessment, and that any further assessment could be accomplished on an outpatient basis. (█████ 23-mc-00024, ECF No. 9 at 19–23, 25–27, 51–52, 60–64). On this record, the Court cannot conclude that inpatient commitment would significantly further the Government's trial-related interests and therefore cannot find that this application of § 4241(d) satisfies the heightened scrutiny that due process requires.

Nevertheless—although mandatory inpatient detention under § 4241(d) cannot be sustained on this record—the Court does not foreclose the possibility that some form of outpatient assessment and evaluation, if otherwise lawful and appropriately tailored, may be consistent with due process. In other words, the Court's conclusion is not that no further proceedings are permissible. It is only that the Constitution does not permit the Government, in this case, to seek

the most restrictive measure of inpatient hospitalization where a less intrusive one would be more reasonably related to the Government's legitimate objective. To date, the Government has refused to consider any less intrusive alternatives. In light of this decision, the Court will nevertheless afford the Government a final opportunity to consider such alternatives and, accordingly, will defer ruling on ███'s request to dismiss the charges.

## CONCLUSION

For the foregoing reasons, the Court finds by a preponderance of the evidence that Defendant ███ ███ is presently incompetent to stand trial. The Court further concludes that, on the specific facts presented here, mandatory inpatient commitment under § 4241(d) would violate due process as applied to ███ because the Government has not shown that such confinement is reasonably related to the achievement of its important interest in restoring ███ to competency for trial. More specifically, such commitment would neither bear a reasonable relation to the statute's restorative purpose nor constitute a reasonable period necessary to determine restorability within the meaning of *Jackson v. Indiana*. Thus, the Government's request that the Court commit ███ to the custody of the Attorney General for inpatient hospitalization under § 4241(d) is denied. At the same time, because the Court's holding is narrow and does not foreclose the possibility that some less intrusive, outpatient measure may be lawful and appropriate, the Court will direct the parties to meet and confer promptly regarding whether any such alternative is available and, if so, under what authority and on what terms it could proceed consistent with due process. If the Government fails to do so, the Court will then consider ███'s request to dismiss the charges. An appropriate Order will follow.

CHRISTINE P. O'HEARN
**United States District Judge**

29